**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James ROSENHEIMER, Defendant-Appellant.**

**No. 85–3067.**

United States Court of Appeals, Seventh Circuit.

Submitted Sept. 30, 1986.[*]

Decided Dec. 5, 1986.

---

* Although oral argument was originally scheduled for September 30, 1986, the appellant's attorney was unable to appear due to illness.

Sheldon Nagelberg, Chicago, Ill., for defendant-appellant.

Bradley E. Lerman, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, and COFFEY, Circuit Judges, and PELL, Senior Circuit Judge.

PER CURIAM.

James Rosenheimer was convicted after a jury trial of devising and executing a scheme whereby he fraudulently acquired thousands of dollars from numerous investors in violation of 18 U.S.C. §§ 1343 and 2314. Because of Rosenheimer's unusual conduct during trial, the court ordered a psychiatric examination following his conviction to determine whether Rosenheimer had been competent to stand trial and whether he had been sane at the time of the criminal acts for which he was convicted. The district court found Rosenheimer was competent at trial and sane at the time of the commission of the crimes. The defendant now appeals only the district court's finding that he was sane at the time of his criminal conduct. We affirm the decision of district court.

### FACTS

From August 1980 through 1982, Rosenheimer carried out a scheme in which he convinced potential investors that, if they paid him substantial advance fees, he could obtain hefty, low-interest loans for them. The would-be investors paid the fees, but Rosenheimer failed to follow through on the loans. Rosenheimer's sole defense at trial was that he sincerely believed in the plan that he had devised to obtain the loans, thus he did not have the required intent to defraud. Rosenheimer testified

The parties therefore decided to waive oral argument and accordingly, the appeal is submitted on the briefs and record.

at trial that he had planned to meet certain individuals in Europe who would have arranged for billions, sometimes trillions, of dollars in loans for him. He also explained that members of the KGB, the C.I.A., the F.B.I., Interpol, the French underground, and the Gestapo had contacted him and that some of these agents had been following him.

After Rosenheimer completed his testimony, the court *sua sponte* raised the issue of his sanity. The court held a conference in chambers with counsel to discuss the issue. At the conclusion of the conference, the court stated that it was "almost certain that [it] was going to order a psychiatric examination" after trial.

After the jury returned its verdict finding Rosenheimer guilty, the court appointed Dr. Jonathan R. Kelly, a psychiatrist, to conduct a psychiatric evaluation of Rosenheimer. Dr. Kelly's preliminary report persuaded the court to commit Rosenheimer to the United States Medical Center in Springfield, Missouri, for a complete 60–day psychiatric evaluation. During this time, the defendant was examined regarding his present mental state, his mental state during trial, and his mental state during the time period when the crime was committed.

On November 13, 1985, an evidentiary hearing was held to determine the defendant's competency to stand trial and his sanity at the time the acts were committed. Before any witnesses were presented, the government's counsel advised the court that, "[c]ertainly under the new rules the burden would be [defendant's], but we are all working under the old rules where I think the burden is probably ours." The government then presented its first witness, Dr. Clayton Pettipiece, a psychiatrist who opined that Rosenheimer was competent at the time the fraudulent transactions took place and at trial. He found that the defendant was suffering from a narcissistic personality disorder, which meant that Rosenheimer sincerely believed in what he did. As an example, he said it was comparable to someone who, after a lifelong pattern of crime in the Mafia, begins to believe that what he is doing is right regardless of its legality. Dr. Pettipiece did not believe that Rosenheimer's disorder reached the level of a psychotic disorder, however, because all of Rosenheimer's apparent delusions had some basis in fact.

Dr. Richard J. D'Andrea, a psychologist who had prepared a report following a series of tests on Rosenheimer, also testified for the government. Dr. D'Andrea found Rosenheimer to be of normal or higher intelligence. According to Dr. D'Andrea, Rosenheimer did not suffer from any mental illness, disease or mental defect, and had no organic brain defect. Dr. D'Andrea determined that, because of his personality disorder, Rosenheimer tended to "fabricate material in a self-serving manner to explain his behavior."

Rosenheimer's counsel called the court-appointed psychiatrist, Dr. Kelly, to testify on the defendant's behalf. Dr. Kelly opined that Rosenheimer was suffering from both a narcissistic personality disorder and a paranoid disorder. He found that the defendant's paranoid disorder manifested itself in psychotic delusional beliefs. One of the delusions from which Rosenheimer apparently suffered was that he would obtain "millions and zillions" of dollars from somewhere in the world. Dr. Kelly stated that psychotic delusions such as this made Rosenheimer unable to conform his conduct to the law and unable to assist in his own defense at trial.

On cross-examination, Dr. Kelly admitted that, if he had found that Rosenheimer's delusions were in some way rooted in fact, it would have certainly made a difference in his diagnosis. The government then proceeded to detail many instances in which the defendant's apparent delusions were indeed based in fact. Dr. Kelly merely stated, however, that, regardless of those facts, he would not have changed his diagnosis. Dr. Kelly did concede that, despite his disorders, Rosenheimer was free from hallucinations and confusion, well-oriented with respect to date, time and place, and capable of clear and orderly thinking. He agreed that it was possible to suffer from a

paranoid disorder and yet know the difference between right and wrong, and be competent to stand trial. Dr. Kelly further agreed that Rosenheimer's manipulative behavior was characteristic of his narcissistic personality disorder, that he had been careful to avoid exposing facts to potential investors that would have dissuaded them from investing, and that he was capable of knowing that his behavior was contrary to law.

At the close of the hearing, the following conversation took place between the counsel for the government and the court:

MR. PEARL: Well, let me just tell you, the existing standard for competency is in 18 U.S.C. 4241. It also describes the consequences if in fact you find him to be incompetent.

THE COURT: All right. That I want to see.

MR. PEARL: And that just embodies the standard. It is Dusky vs. United States, 362 U.S. 402.

MR. CONNELLY: Which I will add, Judge, and I think accurately, that that hasn't changed at all. The 1984 Crime Control Act changed certain aspects of who has the burden, but this standard has remained in place and carries throughout.

THE COURT: All right.

MR. PEARL: And with regard to the issue of insanity I refer you to jury instruction 4.02 and United States vs. Sennett, which is the Seventh Circuit case, 505 Fed.2d. 774.

THE COURT: Great.

The following day, the court ruled that Rosenheimer was competent at trial and sane during the time period of the commission of the criminal acts for which he was convicted. In so ruling, the court stated:

Well, I have looked over the cases and I have looked over the testimony. It is, I think, rather obvious that Mr. Rosenheimer has a personality disorder. I don't perceive in judging the testimony that I am willing to treat it as a matter that rendered him incompetent to stand trial or unable to understand what he was doing in terms of its being right or wrong at the time of the commission of the crime, or that he was unable to assist with his attorney.

So after 18 months of delay I am making a finding that Mr. Rosenheimer was competent to stand trial, was able to cooperate with his attorney and was not suffering from a severe mental impairment at the time of the acts of which he was convicted such that would prevent him from knowing the difference between right and wrong....

Rosenheimer contends that the court employed an incorrect standard for determining whether he was sane at the time the acts for which he was convicted took place. He argues that the court improperly required that his mental defect be severe, erroneously deleted the volitional prong from the pre–1984 insanity defense standard, and incorrectly allocated the burden of proving insanity. For these reasons, Rosenheimer appeals.

## DISCUSSION

■ In discussing the insanity defense in *United States v. Davis*, 772 F.2d 1339 (7th Cir.1985), we stated that:

This circuit has adopted the American Law Institute's definition of the insanity defense, which, until recently, has governed criminal trials in this circuit. *United States v. Shapiro*, 383 F.2d 680 (7th Cir.1967) (en banc). *See* AMERICAN LAW INSTITUTE, MODEL PENAL CODE § 4.01 (Proposed Official Draft 1962). The definition contains a 'volitional prong,' under which a defendant is not responsible for his criminal conduct 'if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity ... to conform his conduct to the requirements of law.' MODEL PENAL CODE § 4.01(1); *see Shapiro*, 383 F.2d at 684....

*Id.* at 1343 (footnote omitted). Under this definition, the defendant is first required to present "some evidence" of a mental disease or defect. *United States v. Sennett*,

505 F.2d 774 (7th Cir.1974). Once the defendant has done this, the burden of proving the defendant's sanity is then allocated to the government. *Id.* at 778.

■ The new federal insanity defense which was enacted in 1984, *see* the Insanity Defense Reform Act of 1984, 18 U.S.C. § 20, differs from the traditional definition in two significant ways. First, the volitional prong of the former definition has been deleted, thus making the defense available only if the defendant suffers from a serious mental disease or defect which makes him unable to comprehend the difference between right and wrong. *Id.* at § 20(a). Second, the new definition makes the defense an affirmative one, *id.*, thereby requiring the defendant to bear the burden of proving by clear and convincing evidence that he was insane at the time the crime was committed. *Id.* at § 20(b). *See Davis,* 772 F.2d at 1343 n. 2.

The defendant contends, and the government does not disagree, that the pre–1984 definition applies in his case since the acts for which he was convicted occurred during 1980, 1981 and 1982.[1] He argues that the court nevertheless relied upon the wrong standard in determining his sanity at the time the offenses were committed because it found only that he was not suffering from a serious mental disease or defect which prevented him from knowing right from wrong at the time the crime was committed. The court did not make a finding as to whether the defendant, as a result of a mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law—the volitional prong of the pre–1984 definition. Rosenheimer argues that the court erred in failing to make such a finding.

The government counters that the court properly relied upon the pre–1984 definition in making its determination. To support its argument, the government initially notes that the court was properly informed regarding the applicable law at the close of

the hearing and that, prior to announcing its ruling, the court indicated that it had in fact considered the pre–1984 case law. The government argues that the court was not required to consider the volitional prong of the test because it found that Rosenheimer's personality disorder did not rise to the level of a mental disease or defect. The government suggests that "a fair reading of the ruling indicates that the Court reached its determination because it did not accept defendant's expert's testimony that the defendant was suffering from psychotic paranoia."

Although the language that the court used in its ruling is somewhat confusing, we agree with the government that the court properly found that the defendant failed to meet his initial burden of presenting "some evidence" of a mental disease or defect. All of the expert witnesses agreed that Rosenheimer suffered from a narcissistic personality disorder. Neither Dr. Pettipiece nor Dr. D'Andrea found, however, that Rosenheimer suffered from a mental disease or defect. Only Dr. Kelly testified that Rosenheimer suffered from a more serious paranoid disorder. Dr. Kelly testified that the paranoid disorder differed from the personality disorder in that it manifested itself in delusions.

■ The government's cross-examination of Dr. Kelly revealed that, even with this disorder the defendant was coherent, free from hallucinations and confusion, well-oriented with respect to date, time, and place, and capable of clear and orderly thinking. The government also elicited from Dr. Kelly that his diagnosis would certainly have differed if he had found that Rosenheimer's delusions were rooted in fact. Earlier, Dr. Pettipiece had given several examples of instances in which Rosenheimer's apparent delusions were based in fact. Presented with these facts, however, Dr. Kelly still held to his original diagnosis that Rosenheimer suffered from a paranoid disorder that manifested itself in psychotic

1. Since neither party challenges the applicability of the pre–1984 definition of the insanity

defense, the court need not address this issue.

delusional beliefs. Dr. Pettipiece testified, on the contrary, that he believed these "delusions" to be merely exaggerations of events that had actually occurred and explained that this type of exaggeration was characteristic of someone with a narcissistic personality disorder. Both Dr. Kelly and Dr. Pettipiece agreed that experts could reasonably disagree about Rosenheimer's condition. When asked whether one suffering from a paranoid personality disorder could know the difference between right and wrong, Dr. Kelly responded that it was possible. Based on the testimony presented at the hearing, the court found that the defendant did not suffer from any mental disease or defect, but rather from a narcissistic personality disorder which is separate and distinct from suffering from a mental disease or defect. Because the court properly found that Rosenheimer failed to present "some evidence" of a mental disease or defect, the government was not required under the pre–1984 definition, to prove Rosenheimer's sanity. We affirm the district court.

AFFIRMED.