123 F.Supp.2d 442 (2000)
UNITED STATES of America, Plaintiff,
v.
David MOONEY, Defendant.
No. 99CR485.
United States District Court, N.D. Illinois, Eastern Division.
November 30, 2000.
Eric Sussman, Assistant United States Attorney, Chicago, IL, for Plaintiff.
Thomas Durkin, Chicago, IL, Patrick Blegen, Plainfield, IL, for Defendants.

MEMORANDUM OPINION AND ORDER
SHADUR, Senior District Judge.
This Court has conducted an evidentiary hearing to consider whether defendant David Mooney ("Mooney") "may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable...to assist properly in his defense," one of the criteria specified by 18 U.S.C. § 4241(a).[1] To that end two witnesses testified: Psychologist Daniel Carlson, who is affiliated with FMC Rochester and studied Mooney during a period of observation and study at that institution, and private psychiatrist Richard Abrams, whom this Court authorized to be retained by Mooney's defense counsel under the Criminal Justice Act and who initially conducted a psychiatric examination of Mooney and then had some follow-up contact with him. Psychologist Carlson, who has been a staff psychologist at FMC Rochester for something over two years, answered the "mental disease or defect" question in the negative, while Dr. Abrams gave an affirmative answer to that question.
*443 After the hearing each side's counsel complied with this Court's request to identify authorities that had addressed the content of the statutory terms at issue. In that respect Dr. Carlson's testimony was that Mooney did not fit into any of the categories of mental diseases identified in the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition ("DSM-IV"). Hence Dr. Carlson viewed Mooney's mental problem as a "personality disorder" something that a few cases later adduced by the prosecution have found does not meet the statutory standard of "mental disease or defect" (United States v. Rosenheimer, 807 F.2d 107, 111-12 (7th Cir.1986) (per curiam) was the only Court of Appeals opinion that the government proffered on that score). For their part, Mooney's counsel have turned up only a few cases of 1960s vintage that suggest "mental disease or defect" to be terms of more flexible content.
Just a few words should be said about Rosenheimer before this Court turns to its evaluation of the testimony. After that opinion had engaged in an extensive discussion of the facts of that case and of the district court's ruling that the defendant there had been competent during the trial as well as sane at the time the criminal acts had been committed, the opinion said this (807 F.2d at 112):
Based on the testimony presented at the hearing, the court found that the defendant did not suffer from any mental disease or defect, but rather from a narcissistic personality disorder which is separate and distinct from suffering from a mental disease or defect. Because the court properly found that Rosenheimer failed to present "some evidence" of a mental disease or defect, the government was not required under the pre-1984 definition, to prove Rosenheimer's sanity.
It would stretch that statement a great deal to read it as a bright-line holding that there are no circumstances under which a condition that fits a "personality disorder" pigeonhole (other than that of narcissism), but that does not necessarily qualify for some DSM-IV classification, can still be a "mental disease or defect" that would render the defendant incapable of assisting properly in his defense. In terms of this case, even if Mooney's diagnosis were properly to be labeled as a "personality disorder" in paper terms (as Dr. Carlson has opined), Mooney's real-life manifestations of his condition  spontaneous violent outbursts that escalate into clearly uncontrollable rage and physical violence  have unquestionably rendered him just as incapable of effective participation in his defense as if he were suffering from the most serious type of mental disease. In short, even if the "personality disorder" label were to be accepted as an apt description, this Court would still have to conclude that Mooney's mental state and the concomitant involuntary rages and outrages that it has generated in the context of trial (and other related in-court proceedings) qualify as the type of "mental disease or defect" that satisfies the Section 4241(a) standard.
But as the ensuing discussion reflects, it is unnecessary to reach that issue to resolve the question facing this Court, for any such tyranny of labels is inappropriate here. This Court's law clerk has made an independent search that has cast further light on the subject by locating some additional cases. Those cases include United States v. Murdoch, 98 F.3d 472 (9th Cir. 1996) and United States v. Hemsi, 901 F.2d 293 (2d Cir.1990), although this Court has reviewed a number of other cases as well. Of particular interest in light of Mooney's conduct and of the differing diagnoses submitted to this Court is the thoughtful and extensive concurring opinion in Murdoch, 98 F.3d at 477-80, which evaluated the DSM-IV categorizations as well as existing case and statutory law in careful detail and summarized that analysis in this way (id. at 479-80):
Although I agree that mere personality quirks or characteristics cannot be construed as mental diseases or defects for *444 purposes of determining legal sanity, I conclude that a personality disorder such as that suffered by Appellant is much more than a mere quirk. It is a systemic, enduring, and severe condition resulting in an extremely abnormal perception of and reaction to everyday events. In short, Appellant's condition is so encompassing and impairing that it rises to the level of a disease or defect.
* * * * * *
Of particular significance is the fact that a personality disorder is more than just a repeated pattern of behavior. It is an enduring pattern of behavior and inner experience which can affect cognition (i.e. ways of perceiving and understandings) and affectivity (emotional reactions). Therefore, it can be said to be "mental." In addition, it does not just manifest itself now and again in response to a particular set of circumstances; it is pervasive and inflexible. It is not just one part of a person's personality which is annoying, distasteful, or rude; it is a trait or group of traits which dominates the person's mental state to the point where they experience significant functional impairment or subjective distress. Thus, it comports with the general connotation of a "disease or defect" in that it is neither a temporary condition nor a chosen way of responding but rather a systemic, impairing psychiatric abnormality.
To much the same effect, Hemsi upheld a determination that a defendant who "suffered from a major psychiatric disorder" (901 F.2d at 294) and who acted out in ways strongly similar to the bizarre behavior that Mooney has exhibited was indeed "suffering from a mental disease or defect rendering him incompetent to the extent that he is unable to assist properly in his defense" (id.).
But in terms of this case, any effort to reconcile any differing judicial views along those lines is totally unnecessary: This Court's evaluation of the witnesses' testimony here obviates the need to resolve any question whether "mental disease or defect" and "personality disorders" always occupy discrete watertight compartments in the mental health universe, as Rosenheimer might perhaps be read to suggest (though any such reading is problematic at best). After careful consideration of the testimony proffered by the two witnesses, this Court credits that of Dr. Abrams, who draws on a wealth of experience and expertise (see Mooney Ex. 3, Dr. Abrams' Curriculum Vita) in expressing the firm opinion that Mooney suffers from a deep depression and feelings of worthlessness that his fits of rage tend to paper over. It is unnecessary to parse all facets of Dr. Abrams' additional and wholly cogent testimony (which should be read in its entirety to be fully appreciated), but his diagnosis of Mooney as indeed suffering from a "mental disease or defect" is totally persuasive.[2]
Indeed, Dr. Carlson's conclusion that Mooney's explosive manifestations of rage represent "volitional behavior" is totally unrealistic and is flat-out rejected by this Court (as it was by Dr. Abrams). Dr. Carlson has not observed, as this Court has on two separate occasions, the totally out-of-control violent behavior by Mooney that has manifested itself in the specific environment of trial and other legal proceedings (an environment that Dr. Carlson of course neither observed nor was able to replicate in the different matrix in which he and other personnel at Rochester necessarily dealt with Mooney). It is clear that the legal proceedings themselves trigger such uncontrollable episodes, and that there is no way to predict what seemingly innocuous factor may set off explosive behavior by Mooney (once again, something *445 on which Dr. Carlson could not really opine). This Court concurs in Dr. Abrams' opinion that the bizarre and dangerous conduct that has been exhibited by Mooney in the specific context of trial and in his working with counsel is entirely non-volitional and is, as Dr. Abrams concluded, the product of a "mental disease or defect" within the meaning of Section 4241(a).[3]
Although what follows is really a parenthetical observation in light of this Court's crediting of Dr. Abrams' well-supported diagnosis, a word should perhaps be added about Dr. Carlson's approach and its total reliance on the DSM-IV pigeonholes. Anyone who has had occasion to address problems in the field of mental health (or its absence) has to be conscious of some fundamental difficulties with the DSM-IV definitions, which will sometimes provide (for example) that someone who exhibits four of seven specified characteristics fits a defined category of mental disease, while someone who exhibits only three of the seven does not. Even apart from the problems inherent in seeking to establish bright-line rules for exploring the arcane mysteries of the human mind, the just-described approach necessarily treats all of the characteristics at issue as somehow fungible and of equal weight, thus ascribing no significance to the subtle differences and gradations that exist in this most difficult field of diagnosis (wholly unlike the objective medical determination whether, for example, a patient has suffered a fracture).
But once again that is a digression, for this Court's ruling is grounded firmly in Dr. Abrams' wholly credible and persuasive diagnosis. In consequence of the conclusion reached by this Court, the picture that now presents itself is that Mooney is unquestionably competent for purposes of the other branch of a Section 4241(a) inquiry (he is certainly able "to understand the nature and consequences of the proceedings against him," for in his rational periods he presents himself as a highly intelligent individual with full awareness of the charge that he is facing and its potential consequences for him). This Court can express no substantive view on the merits of that charge, because the very effort to reach those merits would create the climate in which Mooney cannot function.[4] On the face of the relevant statutes, that seems to create a vicious procedural circle:
1. Under the literal provisions of Section 4241(d) this Court is mandated to commit Mooney to the custody of the Attorney General for hospitalization "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed." As certain as a negative answer to that determination would appear to be in light of (a) Mooney's prior conduct and (b) Dr. Abrams' diagnosis, the statute appears to be unambiguous, leaving no room for discretion.
2. If at the end of the procedure and the time frame specified in Section 4241(d) "it is determined that the defendant's mental condition has not so improved as to permit the trial to proceed," *446 Section 4246 will kick into operation.
3. In literal terms, Section 4246(a) calls for a certification by the director of the facility in which Mooney is then hospitalized that Mooney is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and...suitable arrangements for State custody and care of the person are not available...." That then would return the matter to this Court to conduct a hearing on that score.
4. If that hearing were then to result in an affirmative finding by clear and convincing evidence that the earlier-quoted situation still exists, this Court would then be obligated to recommit Mooney to the custody of the Attorney General (Section 4246(d)). In turn the Attorney General would be obligated to make all reasonable efforts to cause the State of Illinois to assume responsibility for Mooney's "custody, care and treatment," failing which his hospitalization in a federal facility would be required.
Although this Court does not of course prejudge the results of any of the several steps just outlined, it has a deep concern that Mooney may well face long-term (even lifetime) commitment for a charged offense as to which he has not been found guilty and that, even if he were convicted, would not call for anything remotely approaching such a result.[5] In all events, this matter is set for a next status hearing at 1:15 p.m. on December 8, 2000. At that time counsel are expected to address the matters dealt with in this memorandum opinion and order and to discuss what next steps appear to be appropriate. *447 *448 *449 *450 *451 *452 *453 *454 *455
NOTES
[1] All further references to Title 18's provisions will simply take the form "Section."
[2] As background for Dr. Abrams' testimony, his March 15, 2000 letter report to Mooney's counsel (Mooney Ex. 1) and his later March 23, 2000 follow-up letter (Mooney Ex. 2) are also highly supportive of Dr. Abrams' diagnosis. Those exhibits are also attached to this memorandum opinion and order.
[3] Dr. Abrams concluded his testimony during the hearing by characterizing Mooney as very dangerous, with the potential that during one of his episodes of uncontrolled and uncontrollable rage he "could kill someone or tear him apart." That evaluation must also be viewed as realistic, coinciding as it does with the extreme manner in which Mooney's spells of rage have manifested themselves.
[4] With Mooney and his counsel having waived a jury trial on the criminal charge against him, as Mooney was unquestionably competent to do, this Court conducted the first day of what was anticipated to be a short bench trial. During the course of that trial day this Court made some evidentiary rulings against the prosecution and other evidentiary rulings against the defense. At the conclusion of the day Mooney reacted with extreme and frightening violence in direct consequence of the adverse rulings, even though his counsel had apparently told him that they believed things were going quite well in substantive terms.
[5] Mooney has already been held in custody for an extended time frame, so much so that he has said at one point during the proceedings that if he were to be found guilty or to plead guilty (as he is not prepared to do), the Sentencing Guidelines calculation would call for his immediate release. This Court has not of course explored that issue, which does not now pose a matter ripe for judicial determination because it is entirely hypothetical. And because of the proper constraints on judicial involvement that are contained in Fed. R.Crim.P. 11(e)(1), this Court is also unaware whether any consideration may have been given to the possibility of a North Carolina v. Alford plea, which would not involve an admission of guilt on Mooney's part but could cause his prompt release from custody if he is right.